**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

_____

CASE NO. 23-12616

_____

RICHARD BURT,

*Plaintiff/Appellant*,

v.

W. KENT FUCHS, in his official capacity as President of the University of
Florida; DAVID E. RICHARDSON, individually; MARY WATT, individually;
and SIDNEY DOBRIN, individually,

*Defendants/Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
HONORABLE MARK E. WALKER
(1:22-cv-000751-MW)

_____

**APPELLANT'S INITIAL BRIEF**

_____

Richard E. Johnson
Law Office of Richard E. Johnson
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 425-1997
rick@rej-law.com

**C-1**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant/Plaintiff Richard Burt, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files his Certificate of Interested Persons and Corporate Disclosure Statement:

1. Alexander Degance Barnett P.A., Defense Counsel

2. Michelle Bedoya Barnett, Defense Counsel

3. Samantha Giudici Berdecia, Defense Counsel

4. Hope T. Cannon, Magistrate Judge

5. Richard Burt, Plaintiff

6. Sidney Dobrin, Defendant

7. W. Kent Fuchs, Defendant

8. Richard E. Johnson, Plaintiff's Counsel

9. Law Office of Richard E. Johnson, Plaintiff's Counsel

10. David Richardson, Defendant

11. University of Florida

12. Mark E. Walker, District Judge

13. Mary Watt, Defendant

There are no publicly traded corporations involved in this case.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff/Appellant requests oral argument and submits that oral argument will assist the Court's disposition of this case in focusing on the issues and testing the basis and validity of the contentions of the Parties.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT…………………………………….C-1

STATEMENT REGARDING ORAL ARGUMENT …………………………..i

TABLE OF CONTENTS…………………………………………………………...ii

TABLE OF CITATIONS ………………………………………………………iv

STATEMENT OF JURISDICTION…………………………………….…...ix

STATEMENT OF THE ISSUES…………………………………………………..1

COURSE OF PROCEEDINGS BELOW ……...………………………………2

STATEMENT OF FACTS  ..…………………………………………..……2

STANDARD OF REVIEW…………….…………………………………………11

SUMMARY OF ARGUMENT……………………………..……………..…12

ARGUMENT……………………………………………..…………………14

    I.     FIRST AMENDMENT PROTECTS BURT'S SPEECH …… …..……14

    **A. INTRODUCTION** ………………………………..………………..…..14

    **B.** ACADEMIC FREEDOM IN THE SUPREME COURT …………………..18

    **C.** SUPREME COURT'S LATER INTERPRETATION OF GARCETTI …..21

    **D.** GARCETTI IN THE CIRCUITS …………………………………………24

    II.     BURT'S SPEECH IS EITHER CITIZEN SPEECH OR ACADEMIC
         SPEECH AND PROTECTED EITHER WAY ………………………..36

A.    BURT'S EMAILS ARE CITIZEN SPEECH ……………………………..37

  B.     ALTERNATIVELY, BURT'S EMAILS ARE ACADEMIC SPEECH …..41

   III.     QUALIFIED IMMUNITY DOES NOT APPLY ……..…….....……..45

.

   IV.     PROCEDURAL DUE PROCESS CLAIM IS VALID ……..…..……..48

CONCLUSION ……………………………………………..….…..…………52

CERTIFICATE OF COMPLIANCE ……………………………..…………53

CERTIFICATE OF SERVICE ……………………………...……………53

# <u>TABLE OF CITATIONS</u>

## <u>U.S. Supreme Court cases:</u>

*Agostini v. Felton*,
    521 U.S. 203, 237 (1997) …………………………………………….16,32

*Ashcroft v. al–Kidd*,
    563 U.S. 731, 742 (2006) …………………………………………..45

*Board of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972) …………………………………………………49

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532,546 (1985) …………………………………………..49

*Connick v. Myers*,
    461U.S. 138, 150 (1983) ………………………………………17, 40,46

*Epperson v. Arkansas*,
    393 U.S. 97, 107 (1968) …………………………………………………18

*First National Bank of Boston v. Bellotti*,

    435 U.S. 765, 783 (1978) ……………………………………………34

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)……………………………………..12 and *passim*

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) …………………………………………16,20,35

*Healy v. James*,
    408 U.S. 169,180 (1972 …………………………………………35

*Kennedy v. Bremerton School District*,
    597 U.S.507(2022)………………………………………22,24,36,37,47

*Keyishian v. Board of Regents,*
    385 U.S. 589 (1967) ……………………………………………..16,19

iv

*Lane v. Franks*,
        573 U.S. 228 (2014) …………………………………………21,22,23,36,37,47


*Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm'n*,
        29 U.S. 167, 174-5 (1976) …………………………………………………….38

*Minnesota State Bd. for Community Colleges v. Knight*,
        465 U.S. 271, 296-7 (1984) …………………………………………………43

*Mullane v. Central Hanover Bank & Trust Co.*,
        339 U.S. 306, 313 (1950) ……………………………………………………49

*Patsy v. Board of Regents*,
        457 U.S. 496 (1982) …………………………………………………………48

*Perry v. Sindermann*,
        408 U.S. 593 (1972) …………………………………………………………49

*Pickering v. Board of Education of Township High School District 205*,
        391 U.S. 563 (1968) …………………………………………17 and *passim*

*Porter v. Board of Trustees of North Carolina State University*,
        Case No. 23-363 U.S. ………………………………………………………….25

*Shelton v. Tucker*,
        364 U.S. 479, 487, (1960) ……………………………………………..20,21

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) ……………………………………………………...16,19,20,35

*United States v. Hatter*,
        532 U.S. 557, 567 (2001) ……………………………………………………16

*Williams v. Washington*,
        -- S. Ct. --, 2024 WL 133549 (Jan. 12, 2024) ……………………………….48

**Federal Circuit Court cases:**

*ABATE of Georgia v. Georgia*,
      264 F.3d 1315 (11th Cir. 2001) …………………………………………11
*Adams v. Trustees of the University of North Carolina–Wilmington*,
      640 F.3d 550, 562 (4th Cir. 2011) …………………………….…27,28,46

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
      804 F.3d 1149 (11th Cir. 2015) ……………………………………….34

*Battle v. Board of Regents for Georgia*,
      468 F.3d 755 (11th Cir. 2006) ……………………………………….34

*Boyce v. Andrew*,
      510 F.3d 1333, 1341 (11th Cir. 2007) ………………………………46

*Buchanan v. Alexander*,
      919 F.3d 847 (5th Cir. 2019) ………………………………………31

*Carollo v. Boria*,
      833 F. 3d 1322, 1333 (11th Cir. 2016) ………………..…………..45-46

*Demers v. Austin*,
      746 F.3d 402, 411 (9th Cir. 2014) ……………………………..28-30

*Doe v. Valencia Coll.*,
      903 F.3d 1220,1234–35 (11th Cir. 2018) …………………………….48

*Heim v. Daniel*,
      81 F.4th 212 (2023) …………………………………………..26

*McKinney v. Pate*,
      20 F.3d 1550, 1561 (11th Cir. 1994) ……………………………….48

*Meriwether v. Hartop*,
      992 F.3d 492, 506 (2021) …………………………………16,32-33,35

*Porter v. Board of Trustees of North Carolina State University*,
      72 F.4th 573 (2023) ……………………………………………24=26

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) …………………………………………35

*Warren v. DeSantis,*
    --F.4th --. 2024 WL 132518, *11-*12 (11th Cir. Jan. 11, 2024) ……….24,36

*Zen Group, Inc. v. Agency for Health Care Administration*,
    80 F.4th 1319, 1331 (11th Cir. 2023) ………………………………………41

**Federal District Court cases:**

*Buchanan v. Alexander*,
    284 F. Supp.3d 792 (M.D. La. 2018) …………………………………….31

*Burt v. Fuchs*,
    2023 WL 4103942, (N.D. Fla. June 21,2023) ……………………..*passim*

**State Court cases:**

*Decker v. Univ. of W. Fla.,*
    85 So. 3d 571, 574 (Fla. 1st DCA 2012) …………………………………48

**U.S. Constitution**

First Amendment ……………………………………………….11 and *passim*

Fourteenth Amendment...............................................……....11,48,51

**Statutes:**

§1004.097((3)(f), Florida Statutes ……………………………..……………43

28 U.S.C. § 1291…………………………………………………………  iv

**Rules:**

Article 10, University of Florida Collective Bargaining Agreement ……………42

Collective Bargaining Agreement (CBA)Article

10.2(b) ……………………………………………………….…..……..42

Collective Bargaining Agreement (CBA)Article
10.3(b) ………………………………………………………………...8, 10

Federal Rule of Civil Procedure 12(b)(6) ...…………………………………11

UF Regulation 1.008 ……………………………………………………9

UF Regulation 7.048 ……………………………………………...…8,9

### Articles:

Cordova, "An Academic Freedom Exception to Government Control of Employee Speech," 22 The Federalist Society Review 284 (2021) ………………...…….31

David M. Rabban, Academic Freedom, Professionalism, and Intramural Speech, 88 NEW DIRECT. HIGHER ED. 77 (1994); ………………… ………..…….41

Matthew W. Finkin, Intramural Speech, Academic Freedom, and the First Amendment, 66 TEX. L. REV. 1323 (1988) …………………………………41-42

Matthew W. Finkin and Robert C. Post, For the Common Good: Principles of American Academic Freedom. Yale University Press, 2009, at 113 ……..……..41

Scott, et al, "First Do No Harm: Revisiting *Meriwether v. Hartop* and Academic Freedom in Higher Education," 71 Am. U. L. Rev. 977 (2022) ……………..…..31

Keith E. Whittington, *What Can Professors Sayon Campus? Intramural Speech and the First Amendment* 28 (August 2, 2023) (unpublished manuscript), https://ssrn.com/abstract=4551168 (forthcoming in Journal of Free Speech Law). …………………………………………………………………..…….18,42

## **STATEMENT OF JURISDICTION**

This case is an appeal of a final decision of the United States District Court for the Northern District of Florida. Jurisdiction lies under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the adverse actions of the University of Florida violated the First Amendment rights of Professor Richard Burt.

II.   Whether Professor Burt waived his procedural due process rights by failing to exhaust state remedies before bringing a federal claim.

III.  Whether the individual Appellees are entitled to qualified immunity.

## COURSE OF PROCEEDINGS BELOW

Plaintiff filed the Complaint on March 29, 2022, ECF No. 1.  Defendants moved to dismiss, ECF No. 11.  The Court granted the motion to dismiss, ECF No. 22.  Plaintiff moved for reconsideration, focusing on the court's omission of discussion on the special constitutional role of freedom of faculty speech in universities.  The court granted in part the motion for reconsideration, allowing a new motion to dismiss and a response, ECF No. 26.  Defendants again moved to dismiss, ECF No. 27.  Plaintiff opposed the motion, ECF No. 30.  The court granted the motion to dismiss, ECF No. 39.  The clerk entered judgment, ECF No. 40.

This timely appeal followed.

## STATEMENT OF FACTS

Plaintiff is a tenured full professor of English at the University of Florida (UF). ECF No. 1 ¶ 26. In August, 2021, he unknowingly stumbled into the vortex of a controversy that was shaking the administration of the university and contributed to the resignation of its president.  Governor Ron DeSantis, gearing up for a national campaign, had expressed a point of view regarding Covid-19 that he generally describes as "freedom."  This means a general opposition to lockdowns, remote working and remote class attendance, a vigorous opposition to mandatory masking, and limitations on testing and social distancing. *Id.*, ¶14.  These views are shared by

the Chair of UF's Board of Trustees, Morteza "Mori" Hosseini, a DeSantis appointee and a major contributor. *Id.*, ¶ 15.

As the Fall Semester of 2021 approached, certain departments, including those in the College of Liberal Arts & Sciences, such as English, planned to schedule classes remotely by ZOOM for at least the first three weeks of the semester. *Id.*, ¶ 20. DeSantis, who has made resistance to online classes and mask and vaccine mandates part of his political image, was pushing hard at the time to keep public schools and businesses in Florida open. *Id.*, ¶ 20. Hosseini was particularly strident in his disapproval of professors teaching by ZOOM. He fumed in one statement, "This behavior is unacceptable. It is disrespectful not only to the taxpayers of Florida, whose hard-earned dollars pay faculty salaries, but it is also disrespectful to these faculty members' hard-working colleagues," he said. "It is disrespectful to the students who depend on their professors' full attention and commitment. This will not stand. It must stop, and it will stop." These remarks were apparently directed at some remote teaching at UF in the Spring semester of 2021. *Id.*, ¶ 23. Appellant Burt later learned from his Chairman, Appellee Sidney Dobrin, that his English Department was one of the targets. Dobrin said, "We are being watched. There is a black mark next to my name in Tallahassee." *Id.*, ¶ 64.

Then-President W. Kent Fuchs made no effort to conceal his obeisance to DeSantis. In an address to the Faculty Senate on September 23, 2021, Fuchs warned that criticism of the State of Florida's COVID-19 response would "fracture the relationship between the university and the state government ... ultimately leading to a diminished or inability to impact future policies or decisions affecting the university." In other words, if the university did not self-censor, it would be censored from outside or starved. *Id.*, ¶ 24.

Fuchs, in early August, 2021, sent Hosseini a draft email Fuchs planned to send out to the entire university community making all classes face-to-face with no remote options. Fuchs offered to let Hosseini make changes. Hosseini reported to Fuchs that the governor's office had received it. Fuchs followed up with his campuswide email on August 13, 2021, saying there would be no online classes, even temporarily. *Id.*, ¶ 21.

A bit earlier, and being unaware of the events described above, around August 9, 2021, Appellant Burt learned that faculty could teach remotely for the first three weeks of the upcoming semester. *Id.* ¶ 27. On August 13, 2021, however, Appellee Fuchs, issued the memorandum described above, notifying UF faculty that classes could no longer be taught remotely for the semester. *Id.* ¶¶ 6, 30.

On August 16, 2021, Appellee Sidney Dobrin, chair of the UF's Department of English, sent an e-mail "offering a remote option" for teaching courses. *Id.* ¶¶ 9, 38. That same day, Appellee Dobrin scheduled a department meeting for August 18, 2021, on the topic of Appellee Fuchs's August 13, 2021, memorandum. *Id.* ¶ 31. The meeting was not mandatory, and Plaintiff did not attend. *Id.* ¶¶ 32, 71. According to UF Investigator Petra Pindar's report of the meeting, Appellee Dobrin "affirmed that remote teaching was no longer an option for faculty and that they should plan to move forward with face-to-face instruction." *Id.* ¶ 33. At some point that same day, Appellant Burt responded to Appellee Dobrin's e-mail "offering a remote option," stating, "I will be providing a remote option." *Id.* ¶ 38.

On August 19, 2021, Appellee Dobrin e-mailed all faculty in the Department of English, stating that he could not provide minutes of the prior day's department meeting because "[t]he ground is shifting too often for me to convey policies in writing and be comfortable that those policies will remain constant." *Id.* ¶ 35. Appellee Dobrin also stated, "I recognize this is frustrating and that it makes planning for classes on Monday more than complicated." *Id.* ¶ 36. At some point that same day, Appellee Dobrin responded to Appellant's email about a "remote option," simply thanking him for the information. *Id.* ¶ 39.

On August 22, 2021, Appellee Dobrin sent another e-mail to all faculty in the Department of English, stating, "Please remember that if you plan to provide a remote option for your students, you need to notify me and need to be sure that the option is identified on your syllabus and Canvas 1 page by the end of the day tomorrow (Monday, August 22)." *Id.* ¶ 40.

On August 23, 2021, Appellant Burt e-mailed the students in his two courses to inform them that his classes would be held remotely. *Id.* ¶ 41. Appellant attached to that e-mail a statement from the president of UF's faculty union criticizing UF's lack of compliance with Centers for Disease Control and Prevention guidelines on COVID-19 and calling for improvements to UF's COVID-19 response. *Id.*

That same day, Appellee David E. Richardson, the Dean of the College of Liberal Arts and Sciences at UF, received a complaint from one of Burt's students regarding Appellant's decision to teach class remotely. *Id.* ¶¶ 7, 42. The student was the child of parents who were influential political contributors and university donors. *Id.* ¶ 64. Appellee Richardson forwarded the student complaint to Appellee Dobrin, who "'reminded' Appellant that UF policy is 'clear' that all classes were in person ...." *Id.* ¶¶ 42, 44. Appellant Burt asked Appellee Dobrin whether Appellant should send an e-mail correcting his earlier statement and stating that the classes would meet in person. *Id.* ¶ 45.

Later that day, having received no response, Appellant drafted an e-mail to that effect and sent it to Appellee Dobrin for approval. *Id.* ¶ 46. Notwithstanding later disciplinary documents' account that Appellee Dobrin, on receiving the e-mail, expressly told Appellant not to do anything, Appellant received no such directive. *Id.* ¶ 47. Later that same day, still having heard nothing from Appellee Dobrin, Appellant sent a second e-mail to his students "stating that he had been ordered, by his Chair, against his will, to teach his classes face-to-face ...." *Id.* ¶ 48. This e-mail then stated, "You may stop reading here. If you want to learn what happened, you may keep reading. YOU ARE NOT REQUIRED TO KEEP READING. YOU MAY STOP HERE." *Id.* Appellant then included a reproduction of the e-mail exchanges between Appellant and Appellee Dobrin on the subject. *Id.*

On August 24, 2021, about fifteen minutes before Appellant's first class, Appellee Dobrin e-mailed Appellant to cancel his classes for the day, stating, "We will need to address this situation before you meet your students again." *Id.* ¶ 49. On August 25, 2021, Appellee Dobrin informed Appellant that his courses had been assigned to another professor. *Id.* ¶ 52.

On August 30, 2021, at Appellee Richardson's direction, Appellee Mary Watt, an Associate Dean of UF's College of Liberal Arts and Sciences, placed Appellant on paid administrative leave pending investigation. *Id.* ¶¶ 8, 53, 58.  The Watt letter

also barred Appellant from setting foot on campus without explicit direction and from engaging in any activity that involved any aspect of his job, or from communicating with any member of the university community. *Id.* ¶ 53.  On that same day, Watt sent another letter to Appellant, requiring him to submit to a mental exam and to authorize release of the results of that mental exam to the University. Appellant signed all the authorizing documents and submitted to the exam, all under the impression that refusal would cause loss of his job. *Id.* ¶ 54. No UF official ever stated any basis for questioning Appellant's mental health other than his disagreement with the DeSantis regime on protection against Covid.  *Id.* ¶ 55.

The investigation, conducted by Investigator Pindar, initially concerned only whether Appellant had engaged in disruptive behavior prohibited under UF Regulation 1.008. *Id.* ¶¶ 56–57. At some point after Investigator Pindar interviewed Appellant, however, the investigation expanded, to include faculty misconduct, prohibited under UF Regulation 7.048, and a failure of faculty to treat colleagues, staff, and students civilly, in violation of Collective Bargaining Agreement (CBA)Article 10.3(b). *Id.* ¶¶ 59–60. Appellant received no notice of the expanded investigation and no additional opportunity to provide input or rebut the charges of which he was accused. *Id.* ¶ 59. Appellant characterizes the investigation as a "kangaroo" proceeding that "fabricated a factual record ...." *Id.* ¶ 102.

Investigator Pindar issued her Investigation Report on November 8, 2021, and found that all three charges were substantiated. *Id.* ¶ 62. Regarding Appellant's violation of UF Regulation 1.008, the Investigation Report cited both of Appellant's e-mails to students (setting out the remote format, then setting out the in-person format, as well as the attached messages and commentary), Appellant's failure to attend the August 18, 2021, department meeting (which the Investigation Report described as mandatory), and Appellant's failure to obey his supervisors' directives. *Id.* ¶¶ 67, 69, 71. The Investigation Report also stated that Appellant had been dishonest in claiming a good-faith belief, at the time he sent the first e-mail, that the option to hold class remotely was available. *Id.* ¶ 70.

Regarding Appellant's violation of UF Regulation 7.048, the Investigation Report cited Appellant's absence from the August 18, 2021, department meeting and his alleged insubordination in sending the second e-mail after Appellee Dobrin had allegedly directed Appellant not to do anything. *Id.* ¶¶ 72–73. The Investigation Report also cited as insubordination and faculty misconduct Appellant's repeated use of the title "Herr Doktor Rev. Professor Blind Burt Ph.4KUltaHD, Department of loser Studies, Pharmakonology, and Cosmic Criticism" in his e-mail signature block. *Id.* ¶ 73.

9

Regarding Appellant's violation of CBA Article 10.3(b), the Investigation Report stated that Appellant's two e-mails to the students "could be perceived as adversarial and argumentative." *Id.* ¶ 75. It characterized the e-mails as coming "from a place of aggravation and anger at not being able to teach remotely." *Id.*

In a letter dated January 19, 2022, in response to the Investigation Report, Appellees Richardson and Dobrin notified Appellant of a proposal that he be suspended without pay for five days for "misconduct." *Id.* ¶¶ 81,93. The letter also directed Appellant to "[1] comply with all university rules and all directions of the Chair, Dean and university leadership; [2] make all student-related email communications professional and applicable to the immediate discussion; [3] use the correct signature block; and [4] take courses in email effectiveness and cultivating judgment." *Id.*¶ 82. According to the letter, "any future violations will result in the termination of Plaintiff's employment as a tenured professor." *Id.* ¶ 83. According to the Complaint, these requirements constitute a "permanent probation" and set Burt up "to be fired on some pretext." *Id.* ¶¶ 83, 102.

The letter described Appellant's e-mails to students as "improper and unprofessional in content and form" and labeled as "provocative and adversarial" his statement that he had been ordered, by his chair and against his will, to teach in person. *Id.* ¶ 81. The letter provided as "the final reasons for the adverse action"

Appellant's attachment of his email exchange with Appellee Dobrin to his second e-mail to students and his use of the aforementioned title in the e-mail signature block. *Id.*

Appellant alleges two violations of his constitutional rights. First, Appellant argues that his two e-mails are protected speech and that his punishment for that speech violates the First Amendment, as incorporated through the Fourteenth Amendment. ECF No. 1 ¶ 101. Second, Appellant argues that Appellees—in ordering his "permanent probation" and proposed suspension consequent to the e-mail incident—deprived him of property without due process in violation of the Fourteenth Amendment, because the investigation into, and hearing on, the incident lacked procedural safeguards. Id.¶ 102. Appellant sues Appellee Fuchs in his official capacity for equitable relief and the other three Appellees in their personal capacities for money damages. *Id*. ¶¶ 6–9.

## STANDARD OF REVIEW

This Court reviews the procedurally simple dismissal in this case *de novo*. *ABATE of Georgia v. Georgia*, 264 F.3d 1315 (11th Cir. 2001) ("We review *de novo* a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.").

11

## SUMMARY OF ARGUMENT

The district court erred in finding no First Amendment protection for the speech of Professor Richard Burt, specifically, that Burt spoke as part of his job responsibilities and thus as an employee rather than as a citizen, and accordingly lacked First Amendment protection under the rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006). But *Garcetti* does not apply at all on public college campuses. Moreover, if *Garcetti* applies at all to these facts, it does not impair First Amendment protection for the sort of campus-based "intramural speech" at issue here.

*Garcetti* did not overrule or modify any of the Supreme Court's prior jurisprudence, all of which supports Burt's First Amendment rights in this case and none of which confines such protection to teaching and research.

The Supreme Court's post-*Garcetti* cases debunk the canard that First Amendment protection in the employment context is absent when an employee speaks as an employee rather than a citizen. Instead, that jurisprudence reintroduces conceptions of the public interest of the speech at issue and the extent to which the speech may disrupt the workplace.

Of the six occasions when the other federal circuits have considered the application of *Garcetti* to pubic college faculty, only one is in accord with the court below and that one is awaiting a decision on certiorari before the Supreme Court.

12

Burt's speech can qualify as either citizen speech or speech that falls within the academic category because it is about college governance. Under either alternative the speech is protected by the First Amendment. Sending the emails at issue was not part of any duty or responsibility Burt had in his job. For that reason, the emails fall outside the speech that *Garcetti* exempted from First Amendment protection. Further, speech as a citizen and speech as an employee cannot always be readily dichotomized. The roles can blend inextricably. The trial court erred in contending that mixed speech – speech that has some employee speech and some citizen speech -- cannot exist. Established law holds that it does exist. Moreover, the part of Burt's speech that drew a penalty was the citizen part and therefore protected under any standard.

Alternatively, Burt's speech falls into the protected academic speech that *Garcetti* exempts from punishment. First Amendment law recognizes "intramural speech," which is speech about university governance, as within the category of protected academic speech because it is so closely intertwined with the academic freedom of college faculty.

The individual Appellees are not entitled to qualified immunity. First, they acted in the scope of official duty. Second, they violated clearly established law. Moreover, Burt's speech meets the alternative test, that the official conduct was so

13

obviously unconstitutional that its unlawfulness was readily apparent. Burt spoke out to protect the health and safety of faculty and students at a time when hundreds of thousands were dying from Covid and his university leadership was derelict in the face of harm from above. The unconstitutionality of silencing cautionary speech in that context was readily apparent.

The university violated Burt's right to procedural due process. In holding the contrary, the court below misapplied this Court's controlling precedent in a way that violated the controlling holding of the Supreme Court. The Supreme Court has just granted certiorari on a case that makes the same error as the court below in requiring that a plaintiff exhaust all state remedies before bringing a federal due process claim. On the merits, the conduct of the university plainly violates Burt's procedural due process rights.

## ARGUMENT

### I.    FIRST AMENDMENT PROTECTS BURT'S SPEECH

### A. INTRODUCTION

The district court erred in finding no First Amendment protection for the speech of Professor Richard Burt. The opinion below, *Burt v. Fuchs*, 2023 WL 4103942, (N.D. Fla. June 21,2023), held that Burt spoke as part of his job responsibilities and thus as an employee rather than as a citizen, and accordingly

lacked First Amendment protection under the rule of *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  That is wrong on multiple bases. First, *Garcetti* does not apply at all on public college campuses. Second, if *Garcetti* applies at all to these facts, it does not impair First Amendment protection for the sort of campus-based "intramural speech" at issue here.

*Garcetti* was a sharply contested 5-4 decision that drew three strong dissenting opinions that caused some limiting remarks by the majority.  Justice Souter's dissent raised the possibility that the majority opinion could be seen as overturning, *sub silentio*, an important body of precedent establishing the unique position of the academic freedom of college faculty in the First Amendment firmament.  *Garcetti*, 527 U.S., at 438-439 (Souter dissenting).  The majority, *id*., at 425, acknowledged Justice Souter's concern that "expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence," and added that, "We need not and do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id*.

*Garcetti* does not overrule the academic freedom cases relied upon by Justice Souter and acknowledged by the majority.  The Supreme Court has cautioned that it

15

never overrules a case by implication and always does so explicitly, if it is to be done at all.  Thus, no inferior court may decide a case contrary to the dictates of those old precedents unless and until the Supreme Court itself has overruled them expressly. *United States v. Hatter*, 532 U.S. 557, 567 (2001) ("it is [that] Court's prerogative alone to overrule one of its precedents."  So, it is error *per se* to conclude that *Garcetti* overruled or modified in any way the Supreme Court's settled jurisprudence on academic freedom.

At least one court interpreting *Garcetti* has made this point emphatically. *Meriwether v. Hartop*, 992 F.3d 492, 506 (2021), ("But our job as lower court judges is to apply existing Supreme Court precedent unless it is expressly overruled. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997). And here, the Supreme Court has not overruled its academic-freedom cases. It is not our prerogative to set this binding precedent aside.").  The "existing Supreme Court precedent" that the *Meriwether* court held to bar application of *Garcetti* to campus speech consisted of the cases relied upon by Justice Souter in his *Garcetti* dissent, discussed above, *Grutter v. Bollinger*, *Sweezy v. New Hampshire*, and *Keyishian v. Board of Regents* (full citations *infra*).  *Meriwether*, 992 F.3d at 504–05.

These general principles set the foundation for treating campus speech with more protection than that of other places, but these cases do not afford much in the way of

16

rules to apply. First Amendment jurisprudence has relied for that on *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). This is a balancing test that weighs the right of speech on a matter of public concern against the needs of an employer to run an orderly government operation.

A refinement of the *Pickering* test came in *Connick v. Myers*, 461U.S. 138, 150 (1983), where the Court limited First Amendment protection to speech made on matters of public concern. Speech made in one's personal or private interest is not protected. *Garcetti*, at least in the formulation of the court below, removes all First Amendment protection for any speech made as part of a public employee's job, regardless of public interest.

That formulation of *Garcetti* is fundamental error. It stems from a tunnel-vision reading of a passage in the majority opinion, *Garcetti*, 527 U.S., at 425, "We need not and do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." But the court did not establish a change in academic freedom jurisprudence that would limit First Amendment protection to teaching and publication. As one scholar noted recently, "[T]he Court did not purport to create a positive rule regarding academic freedom, let alone consider and delimit the scope of such a rule." Indeed, it was "enough for the majority to acknowledge that the *Garcetti* rule should not be read as

17

so sweeping" as to remove First Amendment protection from a professor's classroom teaching and research. "The Court did not instruct the lower courts to extend the domain of the rule right up to the line of university teaching. It instead cautioned the lower courts that they should not assume the rule extended so far. More substantively, both Souter and Kennedy acknowledged the continuing vibrancy of the academic freedom values that the Court had recognized in its earlier cases and disclaimed any intention to unsettle or undermine those cases. Teaching is the exemplary case of speech protected by academic freedom values, but the Court did not say that teaching is the only such case."[1]

## B. ACADEMIC FREEDOM IN THE SUPREME COURT

The controlling academic freedom precedents protect much more speech than classroom teaching and academic research – core academic functions though they be. Indeed, within the dozen or so Supreme Court cases generally mentioned as within the academic freedom canon, only one is explicitly about classroom teaching and none about academic writing. *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968) (declaring unconstitutional a statute forbidding teaching of evolution). The four cases blessed by both Justice Souter in dissent and Justice Kennedy for the majority

---

[1] Keith E. Whittington, *What Can Professors Sayon Campus? Intramural Speech and the First Amendment* 28 (August 2, 2023) (unpublished manuscript), https://ssrn.com/abstract=4551168 (forthcoming in Journal of Free Speech Law).

in *Garcetti* as precedential touch only indirectly on teaching or research.  The one usually regarded as the brightest star in the academic constellation, *Keyishian v. Board of Regents*, 385 U.S. 589 (1967), found unconstitutional a requirement that professors swear they held no subversive beliefs, that they disclose all past subversive associations, and that they pledge loyalty.  No teaching or research was at issue.  The case is most noted for its sweeping holdings in full protection of a broad sweep of intellectual freedom on public campuses, such as, "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id*., 603.  Perhaps the second brightest star in the constellation is *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), in which a guest lecturer summoned before the legislature refused to answer questions about his lectures or disclose details of his political associations.  Possible reprisal for the content of the lectures was in the general picture, but the actual issue was about the right to refuse disclosure of that content and the lecturer's past political affiliations. In a much broader holding, the Court rose to stirring encomia to academic freedom generally.  "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy

that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id*., 250. And then, "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

The other two cases in the Souter/Kennedy wing of the academic freedom canon are likewise free of connection with teaching and research. *Grutter v. Bollinger*, 539 U.S. 306 (2003), was an affirmative action case in a law school in which the court invoked the First Amendment and academic freedom to justify the decision of faculty and administration to implement a diversity program in law school admissions. In so holding, the Court added the oft-quoted language, "We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Id*., 329. The remaining case, *Shelton v. Tucker*, 364 U.S. 479, 487, (1960), was another McCarthy-era case in which professors and teachers challenged a law requiring them to disclose under oath the names and addresses of all organizations to which they had belonged or contributed in the past five years, along with a new affidavit every

year thereafter, as a condition of employment. The Court invalidated the law, with a moving holding, "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

C. S**UPREME COURT'S LATER INTERPRETATION OF** *GARCETTI*

The Supreme Court has not again taken up *Garcetti* in the context of university faculty, but it has issued two opinions that appear to give more expansive reach of the First Amendment to other public employees and thus to college faculty to whom *Garcetti* might apply in some courts. The hallmark of both cases was to expand broadly the range of speech not considered part of an employee's job and thus considered speech as a citizen and therefore protected.

In the first of these cases, *Lane v. Franks*, 573 U.S. 228 (2014), the Court reversed this Court by finding that a fired college administrator had spoken as a citizen rather than an employee when he testified in court about matters involving his firing of a state legislator who collected a salary in the plaintiff's unit without showing up for work. *Id*., 232. A key element of the Court's analysis is that a factor in deciding whether speech is made as a citizen or as an employee is the degree to which the speech is of public concern, as speech about public corruption clearly is. *Id*., 238. Another factor is whether the speech is merely about the job or a part of the essential duties of the job. *Id*., 239-240. Still another concern is that the speech may be made

21

both as an employee and as a citizen and the public importance of the speech may be the deciding factor that pushes the speech to one side of the line or the other, *Id*. 240-241.  This cannot be squared with the emphatic decision of the court below to reject the possible existence of mixed speech that is made both as an employee and as a citizen.  The court below said that if speech could be partially protected and partially not, it would "render *Garcetti* a nullity," and "render *Garcetti's* holding worthless." *Burt*, *9.  In short, in *Lane*, the "critical question" in distinguishing speech made as an employee from speech made as a citizen is "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Lane*, 573 U.S. at 240. In other words, the Court asks whether Burt "was fulfilling a responsibility imposed by his employment" when he disagreed with UF's Covid policies. One can scarcely imagine that Burt had a "duty" or a "responsibility" to write the emails that caused the trouble. Yet that seems to be the key to the modification that *Lane* made to *Garcetti.*

The only other time to date that the Supreme Court has revisited *Garcetti* is in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). The case concerned a high school football coach who prayed after games on the 50-yard line.  The Court announced a process it named a "*Pickering-Garcetti* inquiry." This is a two-step inquiry.  "The first step involves a threshold inquiry into the nature of the speech at

issue. When an employee "speaks as a citizen addressing a matter of public concern," the Court's cases indicate that the First Amendment may be implicated and courts should proceed to a second step." *Id*. 528. At the second step, the court should engage in a delicate balancing of the competing interests surrounding the speech and its consequences. *Id*. The determination of whether speech is within an employee's job duties is an inquiry that "should be undertaken practical[ly]," rather than "with a blinkered focus on the terms of some formal and capacious written job description." *Garcetti*, 547 U.S. at 424, 126 S. Ct. 1951. To proceed otherwise would be to allow public employers to use "excessively broad job descriptions" to subvert the Constitution's protections." *Kennedy*, *Id.*, 529. In this way, *Kennedy* adds a new lens through which to view *Garcetti*.

A "*Pickering-Garcetti* inquiry" would not have been possible under the original *Garcetti* test. The two tests were mutually exclusive. The pure *Garcetti* test looked only at whether the speech at issue was part of the employee's job. If so, there is no First Amendment protection, period. There was not the slightest consideration of the public importance of the speech nor any balancing of the employee's rights against the employer's right to maintain an orderly and non-disruptive workplace, as one does under *Pickering*. This makes explicit what was already implicit in the *Lane* modification of *Garcetti* – that speech of great public importance can be defined as

outside the scope of duty or defined as protected even if within that scope.  In *Lane* and *Kennedy*, one sees the Supreme Court allowing *Pickering* elements such as public importance and non-disruption to penetrate the previously impregnable boundaries of *Garcetti's* exclusion of First Amendment protection.  In its recent decision in *Warren v. DeSantis*, this Court seemed to show a similar discomfort with the *Garcetti* straitjacket.  2024 WL 132518, *11-*12 (11ᵗʰ Cir. Jan. 11, 2024).  It may well be that the court below and a few others like it have over-read the restrictiveness of *Garcetti* and that the Supreme court will make that clear in *Porter,* discussed below, or some other case, as it has signaled in *Lane* and *Kennedy*. Meanwhile courts will have to continue finding protected speech to be outside the scope of employment, or to meet an academic exception, or to be inside the scope of employment but otherwise protected or to meet the hybrid *Pickering-Garcetti* test. Any of these four categories will fetch First Amendment protection.

## D. *GARCETTI* IN THE CIRCUITS

The circuit courts have rendered six opinions on *Garcetti's* application to public university professors, two of them coming after the opinion under appeal here.  One of those two, *Porter v. Board of Trustees of North Carolina State University*, 72 F.4th 573 (2023), is the only one of the six that reads the law in accord with the court below.  It is also the only one pending before the U.S. Supreme Court, *Porter v.*

*Board of Trustees of North Carolina State University*, Case No. 23-363 U.S. (Distributed for Conference of 1/19/2024). If accepted, that case could determine the outcome of this one. In *Porter*, the Fourth Circuit held that a professor spoke as an employee rather than as a citizen and thus had no First Amendment protection from adverse job action on three occasions. The first time, he ruffled feathers by suggesting at a faculty meeting that a proposal was made without proper research. The proposal was to add a question about diversity to a faculty evaluation form to be completed by students. 72 F.3d at 578. Second, he emailed his colleagues an article about credentialing problems of a proposed faculty member who had been recommended by a committee chaired by one of his colleagues. He added a sarcastic comment ridiculing the faculty colleague. Third, he made an entry in his personal blog scorning a professional association, entitled "ASHE Has Become a Woke Joke." He went on to mock the association as academically illegitimate. *Id*. He suffered adverse action for at least the first two incidents.

The Fourth Circuit found that *Garcetti* limited First Amendment protection for faculty to speech about "scholarship or teaching," with all other employee speech unprotected. *Id*., 582. The court held that the survey question remark was within Dr. Porter's area of expertise and uttered as part of his job, but not part of his research or teaching and thus not protected. Id. 583. Likewise, the court found that the

faculty hiring comment was job related, but not part of teaching or research, and so not protected. *Id.*, 583-584. For the "Woke Joke" comment about the professional association, the court found no "but-for" causation between the speech and the adverse action, thus finding no offense even if the remark were made as a citizen rather than an employee. *Id.*, 584. *Porter* drew a vigorous and cogent dissent. The Supreme Court set the case for conference, then called for a response after the university initially declined one, then set another conference for the day this brief is due. The opinion below came out before *Porter*, but reflects the same crabbed view that professorial job-related speech is unprotected outside the strict confines of teaching and research. The court below narrowly defined teaching to exclude comments about the health and safety of the conditions under which the teaching occurs.

The other academic case applying *Garcetti* that came after the opinion below is *Heim v. Daniel*, 81 F.4th 212 (2023). There, the court found that because a college denied hiring to a professor because his teaching and research did not fit with the academic preferences of the department at issue and because his views could not be "collaborative" with the rest of the faculty, the case fell outside *Garcetti*. The case was purely about the content of teaching and research, so *Pickering* applied instead of *Garcetti*. *Id.*, 227-228. In applying that balancing test, the court found that the

26

professor's speech met all the conditions of protected First Amendment speech, but that it was balanced not against what the employer wanted but against what the rest of the faculty wanted and what the university defined as its mission. Thus "academic freedom" militated in favor of what kind of faculty the university wanted in its economics department. *Id*. 230-231.

The remaining four *Garcetti* progeny in the circuits were treated in the opinion below in what seems like a tendentious and result-oriented fashion.

The earliest case to find *Garcetti* inapplicable to campus speech was *Adams v. Trustees of the University of North Carolina–Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011), holding that, "We are ... persuaded that *Garcetti* would not apply in the academic context of a public university as represented by the facts of this case." Professor Michael Adams had written a number of controversial pieces in addition to his refereed articles and had mentioned that controversial work in his application for promotion. The university denied promotion based on those articles and some similar speeches, arguing that since publishing was part of Adams' job description, everything he published was "government speech" in light of *Garcetti*. In rejecting *Garcetti's* application to universities, the appeals court read a directness requirement into *Garcetti*. As the court explained, "Adams' speech was not tied to any more specific or direct employee duty than the general concept that professors will engage

in writing [and] public appearances." *Id*. This "thin thread" connecting Adams' speech to his official duties was, for the court, "insufficient to render Adams' speech 'pursuant to [his] official duties' as intended by *Garcetti*." *Id*.  The court narrowed the definition of speech pursuant to official duties to speech directly or expressly pursuant to official duties.  How workable a test this may be in various situations is not the point.  Rather the point is that an academic exception to *Garcetti* has developed in the courts and it would be error not to apply it in this case where Burt's speech about Covid was so intimately associated with his teaching. The take of the court below on *Adams* was that the case allowed for the possibility that "*Garcetti* may apply" to "specific instances" of a faculty member's duties.  *Burt*, 2023 WL 4103942, \*7.  That simply misunderstands the case.

The court in *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014), forged the second federal appeals court formulation of the academic exception to *Garcetti*, saying, "We conclude that if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court." Washington State University professor David Demers bypassed his campus structure committee and submitted a restructure plan for the communications department to the media and to top administrators and faculty. Demers was a member of the communications faculty and the structure

28

committee, so the district court approved disciplining him because the writing was within his official duties and violated adherence to proper channels by leapfrogging over the first steps. The appeals court agreed that the writing was within Demers' official duties, but held that did not matter because *Garcetti* did not apply on campus. The court said, "*Garcetti* does not — indeed, consistent with the First Amendment, cannot — apply to teaching and academic writing that are performed "pursuant to the official duties" of a teacher and professor. We hold that academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*." *Demers*, *id*. 412.

Notably, the writing at issue did not pertain to a class or to a scholarly publication. It was an administrative proposal to restructure an academic department. The application of the First Amendment was consistent with the way *Garcetti* itself applied the First Amendment when it spoke of speech "related to" teaching and scholarship. It was also consistent with the way the UF CBA, discussed *infra*, conceived the First Amendment when it spoke of protection for speech about university "governance," and, further, consistent with the way Professor Burt speaks herein of application of the First Amendment to his comments about teaching class remotely in a time of Covid.

Having decided that the *Pickering* analysis is not replaced by the *Garcetti* analysis for campus speech, the *Demers* court stressed that speech is protected well beyond the boundaries of teaching and scholarship, adding that other writing pursuant to official duties, including "memoranda, reports, and other documents addressed to such things as a budget, curriculum, departmental structure, and faculty hiring . . . may well address matters of public concern under *Pickering*." *Demers*, *id.*, 416.

The analysis of the Ninth Circuit thus departs from that of the Fourth Circuit. The Fourth, in *Adams*, found the speech protected because the court defined the speech as outside the scope of official duties, whereas the Ninth, in *Demers*, found the disputed speech within the scope of duty, but still protected because *Garcetti* does not apply on campus, where *Pickering* confers First Amendment protection. The court below erroneously claimed that the Ninth Circuit found Professor Demers advocacy of restructuring his department to be academic speech, though it was aimed only at feathering his own nest and published nowhere.  In fact, *Demers*, 746 F.3d at 416, specifically notes that the professor's writing at issue was not "scholarship," protected by *Garcetti,* but other faculty writing protected by *Pickering*.

30

The Fifth Circuit, in *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), affirming, *Buchanan v. Alexander*, 284 F. Supp.3d 792 (M.D. La. 2018), created an exception to *Garcetti* on campus speech, again adopting a *Pickering/Connick* test as a substitute.  That, at least is the conclusion of the leading scholar on the right and the leading scholar on the left on academic exceptions to *Garcetti*. See, Cordova, "An Academic Freedom Exception to Government Control of Employee Speech," 22 The Federalist Society Review 284 (2021), and Scott, et al, "First Do No Harm: Revisiting *Meriwether v. Hartop* and Academic Freedom in Higher Education," 71 Am. U. L. Rev. 977 (2022).

*Buchanan* differs from the other cases under discussion in that, though the courts at both levels found an academic freedom exception to *Garcetti,* the plaintiff still lost at both levels. One knows the Fifth Circuit was aware of *Garcetti* because the district court case it affirmed discussed *Garcetti* in finding an academic exception to *Garcetti's* strictures, calling for application of the *Pickering* test instead.  The Fifth Circuit, however, chose not to even mention *Garcetti*.  But the court found the *Pickering* test to be the correct application of First Amendment law to university affairs.  However, even under that expansive liberty, the plaintiff still had no protection for her pointless and pervasive vulgarity and penchant for discussing her own and her students' sex lives in front of the class.  By contrast, the content of

31

Professor Burt's speech was temperate and reasonable discourse on a matter of great publicconcern.

The Sixth Circuit has also established an academic exception to *Garcetti*. *Meriwether v. Hartop*, 992 F.3d 492, 506 (2021), ("But our job as lower court judges is to apply existing Supreme Court precedent unless it is expressly overruled. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L.Ed.2d 391 (1997). And here, the Supreme Court has not overruled its academic-freedom cases. It is not our prerogative to set this binding precedent aside."). The "existing Supreme Court precedent" that barred application of *Garcetti* to campus speech consisted of the cases relied upon by Justice Souter in his *Garcetti* dissent, discussed above, *Grutter v. Bollinger*, *Sweezy v. New Hampshire*, and *Keyishian v. Board of Regents*. *Meriwether*, 992 F.3d at 504–05.

The court then relied on this tradition of First Amendment concern for academic freedom to recognize an academic freedom exception to *Garcetti* that "covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not." *Id*., at 507. This is a formulation that would protect Professor Burt's criticism of UF's Covid policies and of his being forced to teach in person against his will, even if those comments included something about class scheduling. Indeed, at the time of *Garcetti,* email

32

was not in official use yet at some colleges. Housekeeping matters like scheduling and location of classes were announced in class rather than by computer.

The *Meriwether* court found that the academic exception applies to all speech on matters of public concern because "the need for the free exchange of ideas in the college classroom is unlike that in other public workplace settings." In university classrooms, "there are three critical interests at stake (all supporting robust speech protection): (1) the students' interest in receiving informed opinion, (2) the professor's right to disseminate his own opinion, and (3) the public's interest in exposing our future leaders to different viewpoints." *Id.*, 507. Universities are created and operated and financed to accomplish these very purposes. This cannot be said of the Department of Transportation, or the Army Corps of Engineers, or even the K-12 public schools. Disputation, even about how the place is run, is part of the mission and purpose of a university, unlike any other public employer. There is, of course, a limit on speech that disrupts the orderly operation of the institution, but UF obviously had to strain itself into the far-fetched to contrive anything approaching disruption in this circumstance. *Meriwether's* first two bases for protecting academic speech, the professor's right to speak and the student's right to receive information are well covered by the cases discussed above. But the third point made in *Meriwether* has been underappreciated in more recent jurisprudence.

33

Part of the reason universities exist is to prepare future leaders in every sector of society for the rough-and-tumble world that awaits them. That entails the clash of ideas in the campus community, limited only by the need for orderly functioning of the institution. This dovetails with another neglected First Amendment doctrine holding that such rights are treated more expansively because they are designed in part for the benefit of the audience as well as the speaker. Thus, a waiver of a First Amendment right injures a society as whole, not just the silenced individual. The Supreme Court has underscored this principle:

> [T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.

*First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

This Circuit has not addressed the academic exception to *Garcetti*. Research has uncovered no case in which it has even been presented. This Circuit has had a few *Garcetti* cases involving university personnel, but they have mostly been non-academic, such as the financial aid officer in *Battle v. Board of Regents for Georgia*, 468 F.3d 755 (11th Cir. 2006), or the staff psychologists in *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149 (11th Cir. 2015). However, more recently, in a student expression case containing much language that has previously applied to faculty, this Court has registered its robust and uninhibited endorsement of the

special role of the university in free expression. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022). This Court held in language reminiscent of that in *Meriwether, supra*, that, "Nowhere is free speech more important than in our leading institutions of higher learning. Colleges and universities serve as the founts of—and the testing grounds for—new ideas. Their chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Id*., 1128. This Court then acclaimed Supreme Court precedents on free speech in universities, "It's hardly surprising, then, that the Supreme Court has 'long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition,'" citing, *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003); *Healy v. James*, 408 U.S. 169,180 (1972) ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.' "); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring) (emphasizing that a "free society" depends "on free universities"). *Id*, 1129. This Court concluded that panegyric to academic freedom, "Accordingly, it is imperative that colleges and universities toe the constitutional line when monitoring, supervising, and regulating student expression. Despite what

we presume to be the very best of intentions, it seems to us substantially likely that the University of Central Florida crossed that line here." *Id*, 1129.  As shown above, this Court has cited approvingly the same cases about faculty free speech that moved the other courts that have found the exception.  More recently, in a non-academic context of MAGA censorship, this Court rejected misapplication of *Garcetti* to the freedom of speech of an elected prosecutor.  *Warren v. DeSantis*, --- F.4th ----, 2024 WL 132518 (11th Cir. Jan. 11, 2024).   As the Founders intended, the First Amendment protects against the "woke" censors in *Adams* and *Meriwether* as well as the MAGA censors in this case and in *Warren*. As Judge Newson put it in ending his concurrence in *Warren*, "What's good for mine is (whether I like it or not) good for thine." *Warren*, 2024 WL 132518, at *24.

## II.    BURT'S SPEECH IS EITHER CITIZEN SPEECH OR ACADEMIC SPEECH AND PROTECTED EITHER WAY

The court below found that *Garcetti* divests Professor Burt of his First Amendment rights because the emails to his students were within the scope of his job but not related to his teaching or research.  That is error either way.  Professor Burt's speech is either citizen speech outside of job duties under the Supreme Court decisions in *Lane* and *Kennedy* or, alternatively, within the realm of protected academic speech because it is so academic-adjacent as to be "intramural speech."

36

A. **BURT'S EMAILS ARE CITIZEN SPEECH**

The beef of the University of Florida is that Burt sent the emails at all. UF does not claim that Burt was performing his duty or responsibility in sending the emails nor that his job in any way required him to send them. But the court below held that because Burt could not have sent the emails if he were not a professor, he necessarily did so pursuant to his job. If that ever held water, it no longer does. It simply proves too much. Burt would never have been on the UF campus but for his job as a professor, but that does not divest him of protection for every utterance he makes on campus. As the *Lane* court observed, "The *Garcetti* Court made explicit that its holding did not turn on the fact that the memo at issue "concerned the subject matter of [the prosecutor's] employment," because "[t]he First Amendment protects some expressions related to the speaker's job." *Lane*, 573 U.S. at 240, (quoting *Garcetti*, 547 U.S., at 421). UF paradoxically maintains that Burt's emails were part of his job but that he should not have sent them. That may be theoretically possible, but after *Lane* and *Kennedy*, it is clear that the employee must be performing a "duty" or a "responsibility" to fall outside the category of "citizen" because so much that is protected is job-related. And though *Garcetti* itself abjures strict reliance on an official job-description, that is because so many duties and responsibilities are not included, not because all job-related speech is unprotected.

Speech as a citizen and speech as an employee cannot always be readily dichotomized. The roles can blend inextricably. For example, the Supreme Court once noted that a teacher "addressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government." *Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 174-5 (1976). Separating the two roles can be like trying to unscramble an egg. If a professor were ordered to seat his black students along the back rows of the classroom and he obeyed, while protesting that he was complying against his will, while attaching his dissenting correspondence with his superiors, few federal judges would pull *Garcetti* rank on him when he sued for his punishment. No meaningful or material distinction can be drawn between that hypothetical and the instant circumstance in which Burt objected that he and his students could be exposed to Covid on orders from above and against his will. It makes less sense to parse the speech into official speech, on the one hand, setting class by ZOOM and then correcting that by setting class in person, and citizen speech, on the other hand, protesting violation of official federal safety standards and attaching public records showing more protest up the chain of command on a disease that killed more than a million Americans. The order appealed here concludes that the speech was primarily for the purpose of scheduling, so it was

mostly official and thus unprotected. But the university never objected to the official part of the speech. Professor Burt made a mistake in initially thinking he could teach remotely, but he corrected that immediately. It was the citizen part of his emails that caused the discipline – that his disagreement with the university's implementation of the Covid policy of the DeSantis regime caused discomfort of at least one student and some administrators.

The Court in *Garcetti* (*id*., at 421) stressed the principle that speech about one's job can be protected by the First Amendment, quoting *Pickering*, "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S., at 572.

Moreover, the sort of viewpoint discrimination UF inflicted on Burt violates the First Amendment. It was only because Burt disagreed with the DeSantis regime and the English Department Chairman on remote teaching that he suffered any penalty at all. It is beyond dispute that if the viewpoint he expressed in an email to students were the opposite, there would not have been adverse action by UF. Suppose, for example, that Plaintiff had written the students: "*President Fuchs has followed the wisdom of Gov. Ron DeSantis in imposing a ban on remote teaching. I had initially*

*opposed this, but was enlightened by the insights of our Department Chair Sid Dobrin. I attach that email exchange for your edification."* Is it conceivable that Plaintiff would have been banned from campus, stripped of teaching, barred from all communication with the university community, and ordered to an involuntary mental exam for this? It is not. If Plaintiff had supported the DeSantis regime and the UF administration on Covid, he would not have suffered adverse action. For this case, at this stage, that makes all the difference.

As noted above, even if the class scheduling were part of his official duties, those parts of his emails were not the subject of the adverse action against Burt. All the punishment was for his opinions about Covid and UF's handling of it. That disease killed a million Americans and was the hottest of hot topics at the time. It is the quintessential issue of public importance. But the court below refused even to consider that, saying that if speech could be partially protected and partially not, it would "render *Garcetti* a nullity," and "render *Garcetti's* holding worthless." *Burt*, \*9. This was not explained in any way. But, as shown above, the Supreme Court in both *Lane* and *Kennedy* made extensive use of the "issue-of-public-importance" criterion in defining citizen speech. It is not so arduous an undertaking. On the closely-related inquiry of whether speech is of public concern or not, courts since *Connick v. Myers*, 461 U.S. 138, 149 (1983), have routinely slogged through

multiple contentions in a speech or essay to determine whether even one can be singled out for First Amendment analysis.  This Court recently observed, "A document may relate to a matter of public concern even if only a fraction is devoted to that issue." *Zen Group, Inc. v. Agency for Health Care Administration*, 80 F.4th 1319, 1331 (11th Cir. 2023).  Justice demands the same diligence for determining whether speech is made as a citizen, especially now that part of that inquiry is whether the speech is of public concern.

### B. ALTERNATIVELY, BURT'S EMAILS ARE ACADEMIC SPEECH

The court below erred in restricting the conception of academic speech to classroom teaching and research.  The law has long recognized a species of discourse protected by the First Amendment that involves speech by professors on the governance of their universities.  This is called "intramural speech."  Perhaps the best definition of the term comes from a book by Matthew Finkin and Robert Post, who characterized it as, "faculty speech that does not involve disciplinary expertise but is instead about the action, policy, or personnel of a faculty member's home institution."[2]  The concept has a small but important body of scholarly literature. [3]

---

[2] Matthew W. Finkin and Robert C. Post, For the Common Good: Principles of American Academic Freedom. Yale University Press, 2009, at 113.

[3] See, e,g., David M. Rabban, Academic Freedom, Professionalism, and Intramural Speech, 88 NEW DIRECT. HIGHER ED. 77 (1994); Matthew W. Finkin,

The recent *Garcetti* progeny in the circuits elicited a particularly valuable addition to the literature.[4]

The right of faculty to speak about governance is so essential a part of academic freedom that it is part of collective bargaining contracts such as the one governing the Appellee university in this case. In at least two places, Article 10 of the University of Florida Collective Bargaining Agreement (CBA) specifically addresses freedom of faculty to do what Plaintiff did. The general language of Article 10.2 guarantees the right of faculty "**to speak freely on all matters of university governance**, and to speak, write, or act in an atmosphere of freedom and confidence." (Emphasis added.) Further, at Article 10.2(b), the CBA states, "Faculty members shall have freedom to present and discuss, frankly and forthrightly, academic subjects and policy, **university governance, or other matters pertaining to the health of the University**." (Emphasis added.) The issue of remote versus in-person teaching was a critical issue of campus governance at that time. The CBA has no constitutional status, but it is a good reflection of what courts, universities, faculty, and their lawyers thought to be the post-*Garcetti* state

---

Intramural Speech, Academic Freedom, and the First Amendment, 66 TEX. L. REV. 1323 (1988).

[4] See Whittington, supra, note 1.

of First Amendment law on campus and the behavior that all those interests considered acceptable and the standards on which they had reliance interests at that time.   That understanding is strongly reinforced by §1004.097((3)(f), Florida Statutes, which provides, "A Florida College System institution or a state university may not shield students, faculty, or staff from expressive activities."

The constitutional significance of faculty speech about university governance is underscored by the Supreme Court in *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 296-7 (1984) ("This First Amendment freedom to explore novel or controversial ideas in the classroom is closely linked to the freedom of faculty members to express their views to the administration concerning matters of academic governance.") (Brennan, J., dissenting).   Though written in a dissenting opinion, the quoted passage had no opposition from the other justices, who agreed faculty should be free to speak on university governance but rejected Justice Brennan's notion that the university officials should be compelled to listen to that faculty speech and include faculty voices in decision making.   The protection for faculty speech about campus governance is at its zenith when it concerns matters of vital public interest.   The Covid pandemic, which took over one million lives in this country alone, is as vital public interest as has ever existed.

Nor did the trial court perform any balancing at all as prescribed by the Supreme

43

Court in *Kennedy*, and years before in *Pickering*.  In its argument below, UF did some. The balancing all boils down to whether the alleged disruption of Burt's two emails to his students so badly damaged UF that the damage outweighs Burt's First Amendment right to expression about the threat to the health, safety, and welfare of the campus community of UF's non-compliance with CDC protocols.

In weighing that against the disruption, UF strains to find anything except a departure from the DeSantis orthodoxy.  UF contends that Plaintiff's emails "incited concern and worry among the students." But nothing requires a defense assertion to be taken as true.  Moreover, the only known student concern came from one querulous child of wealthy donors who thought the United Faculty of Florida was a "protest group" to which Burt belonged. That is not the person whose comfort should be the standard for what professors can say on the UF campus

UF also cites the pique of members of the UF administration at what Burt wrote as proof that their adverse actions were justified.  But this is simply circular reasoning that assumes the administrators conduct was right because it was their conduct.  Moreover, it is itself a bit of a concern that the university took so overbearing a regimen of action over the "concern and worry" of those who might be disturbed over what Burt wrote.  The idea that faculty must be silenced to protect

44

persons of such delicate sensibilities is inconsistent with the very concept of a university.

## III.   QUALIFIED IMMUNITY DOES NOT APPLY

The court below, having already found no First Amendment violation, noted that qualified immunity thus could not be overcome.  The court added that even if there had been a First Amendment violation, the law was not clearly established enough to overcome qualified immunity. *Burt*, 2023 WL 4103942, *10.  This misapprehends the law.

Burt has shown both that clearly established law gave the individual Appellees fair warning their treatment of Burt was unconstitutional, and that their conduct was so obviously unconstitutional that its unlawfulness was readily apparent.  There is no dispute that they acted within their official authority.

*Carollo v. Boria*, 833 F. 3d 1322, 1333 (11th Cir. 2016), is a case in which the plaintiff successfully cited both *Pickering* and *Garcetti* as the clearly established law that gave fair warning that the adverse actions against the plaintiff were unconstitutional.  Though the Supreme Court has cautioned lower courts not to define clearly established law "at a high level of generality." *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2006), there are times when even a general precedent sufficiently defines the contours of an issue that its application is apparent.  Thus, the *Corollo*

court was able to, "conclude that *Pickering* and *Garcetti* gave reasonable public officials fair warning that it violates the First Amendment to terminate a colleague in retaliation for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." Notably, this Circuit has repeatedly described as "clearly established" law the principle "that an employer may not demote or discharge a public employee for engaging in protected speech ...." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (citations omitted).

*Carollo* found that, "A robust consensus of our precedent confirms that the district court was correct to rely upon *Pickering* and *Garcetti* as a basis for fair warning to appellants" (*id*., 1334, citing four cases). Thus, there is binding authority in this circuit that *Pickering* and *Garcetti* are not cast at too high a level of generality to serve as fair warning of a violation of a public employee's First Amendment rights when that employee's non-disruptive speech as a citizen on an issue of public concern is punished. Though there are claims of disruption, as shown above those claims are weak and perfunctory.

*Adams v. Trustees of the University of North Carolina–Wilmington,* 640 F.3d 550, 562 (4th Cir. 2011), discussed above as one of the other-circuit cases finding an academic exception to *Garcetti*, also denied qualified immunity to the individual defendants. Citing *Garcetti* itself as well as *Pickering/Connick* and a local

precedent, the court found that the underlying right – that of a public employee to speak on matters of public concern – is clearly established and something a reasonable person in the defendant's position should have known was protected. The Fourth Circuit is not among the courts that can clearly establish law for qualified immunity purposes in this circuit. Still, it is instructive and persuasive to compare its reasoning on the subject identical to the one in this case to the reasoning of this Circuit in *Carollo* and the four additional cases it collects.

To be sure, the Supreme Court in *Lane,* 573 U.S. at 243, found that the law at that time was not clearly established enough to overcome qualified immunity. But *Lane* itself and *Kennedy* after it, as discussed *supra,* left no doubt that Burt's speech fits comfortably within the embrace of the First Amendment. So now the law is clearly established.

Even if the cases cited were not sufficient to show clearly established precedent, the speech at issue meets the alternative test, that the official conduct was so obviously unconstitutional that its unlawfulness was readily apparent. Burt spoke out to protect the health and safety of faculty and students at a time when hundreds of thousands were dying from Covid and his university leadership was derelict in the face of harm. The unconstitutionality of silencing cautionary speech in that context was readily apparent.

47

## IV.    PROCEDURAL DUE PROCESS CLAIM IS VALID

The procedural due process claim is a back-up.  If Burt succeeds on the First Amendment claim, he will have the same injunctive relief the due process claim would afford anyway.  The court below relied upon *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994), for the proposition that a plaintiff must exhaust all state-law remedies before bringing a federal due process claim, citing also, *Decker v. Univ. of W. Fla.,* 85 So. 3d 571, 574 (Fla. 1st DCA 2012), and *Doe v. Valencia Coll.*, 903 F.3d 1220,1234–35 (11th Cir. 2018), holding that a plaintiff can seek certiorari review in state court, so that state exhaustion must precede a federal due process claim.  But that is incorrect.  In *McKinney* itself, Judge Hatchett, specially concurring, without contradiction, wrote, "[W]e we are not holding that one who suffers a due process violation must first seek relief in state courts, or follow state administrative procedures before bringing a lawsuit in the federal courts. The Supreme Court rejected such a contention over twelve years ago in *Patsy v. Board of Regents*, 457 U.S. 496, 102 S. Ct. 2557, 73 L.Ed.2d 172 (1982)."  In reading *McKinney* in a way that conflicts with *Patsy,* cases such as *Decker* and *Doe* violate binding precedent.  Indeed, the Supreme Court has, within the last few days, granted certiorari to decide exactly this question. *Williams v. Washington*, -- S. Ct. --, 2024 WL 133549 (Jan. 12, 2024).  There is no way Burt could have brought a certiorari

48

petition in state court anyway because the penalty he sought to enjoin had not yet been imposed. He did not have to wait to suffer the injury before suing to stop it.

UF subjected Professor Burt to a kangaroo process. The Due Process Clause requires that deprivation of a public employee's liberty or property interest must be preceded by notice and an opportunity for a hearing on the matter. *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950). The Supreme Court has held that pre-termination procedures need not be elaborate: "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The right to notice and a hearing had been established in the college faculty context in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), and *Perry v. Sindermann*, 408 U.S. 593 (1972). Professor Burt did not get notice of the charges against him. He was notified of one charge, prior to being interviewed and submitting his written defense. There was no hearing. UF issued a report, later adopted by the Dean (David Richardson) and the Department Chair (Sidney Dobrin), finding Professor Burt guilty of three charges. He had no notice whatever of the second two charges. The first he heard of them was that he had been found guilty of them.

49

When the Investigator sent Professor Burt her investigative report, she wrote in her email that the investigation was closed.  Professor Burt could write a letter of reply, she wrote, and it would go in his file.  But such a letter would have no bearing on her report.   Plaintiff effectively had no opportunity to answer the charges in any meaningful way.  This was another violation of the basic due process established in *Roth* and *Perry*.

Moreover, two factual errors figured prominently in the narrative explaining the findings of guilt. Professor Burt was found guilty of violating a rule requiring attendance at a department meeting when no such rule existed nor has ever existed. Moreover, Professor Burt was found guilty of violating an order from Dobrin to "do nothing" when Dobrin never gave any such order.   The falsity of these two allegations is indisputable, yet Burt was found guilty of both in a kangaroo proceeding and then told he could henceforth be fired for violating any university rule or any direction given by a superior. Dobrin, who co-signed the post-investigation disciplinary finding knew full well that his department's faculty meetings had no mandatory attendance for the meeting at issue or any other meeting. The investigator knew there was no such requirement because it is not in writing anywhere and she cites nobody who told her that orally.  There is no source at all for this fabrication that figured so prominently in the justification for the decision to

50

discipline. The claim that Professor Burt sent an email to the students after Chairman Dobrin told him to do nothing is also a blatant fabrication. The totality of the correspondence was in the record before the investigator with no such content anywhere in it. Further, the correspondence showed Professor Burt's almost desperate and unsuccessful efforts to get a phone call or a meeting with Chairman Dobrin on the relevant days. It is not clear whether Dobrin told the investigator that he instructed Burt to "do nothing," but it is beyond dispute that it never happened and that Professor Burt was punished for it.

Part of the punishment also violates the due process interest in both liberty and property as protected by the Fourteenth Amendment procedural due process cases cited above. Under the proposed discipline, Burt would be required to "comply with all university rules and all directions of the Chair, Dean and university leadership" and that "any future violations will result in the termination of Plaintiff's employment as a tenured professor." The termination of a tenured professor is no small matter. It requires a serious offense or a course of conduct evincing unfitness for service as a professor. There are elaborate procedures and full due-process protections. Here, those rights were nullified. The proposed discipline would place Professor Burt in a status in which he could be fired for an overtime parking violation or fired for disobedience to some petty and ambiguous directive of the chair, the

dean, or some unspecified other "university leadership."  In other words, this letter purports to remove Professor Burt's tenure protections and place him on what amounts to the status of an at-will employee.  The stripping of tenure from a professor is the taking of a valuable property interest that requires full due process that Burt did not get.  Accordingly, he is entitled to go to trial on that issue.

## CONCLUSION

This Court should reverse the opinion below and remand the case for completion of discovery and trial. The university violated Professor Burt's First Amendment and Fourteenth Amendment procedural due process rights.  The individual Appellees are not entitled to qualified immunity.

Respectfully submitted,

 */s/ Richard E. Johnson*
Richard E. Johnson
Florida Bar No. 858323
Law Office of Richard E. Johnson
314 West Jefferson Street
Tallahassee, FL 32301
Telephone:  (850) 425-1997
Facsimile:  (850) 561-0836
rick@rej-law.com

Attorney for Plaintiff/Appellant

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, it contains 11,959 words in the pertinent sections of the Brief.

 */s/ Richard E. Johnson*
Richard E. Johnson

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via the Court's system and U.S. Mail to the attorneys of record this 19th day of January, 2024.

 */s/ Richard E. Johnson*
Richard E. Johnson